SUMMARY ORDER
Plaintiffs-Appellants appeal from a judgment of the district court (Chin, J.), entered March 24, 2008, granting defendants’ motion to dismiss the Consolidated Amended Complaint (“Complaint”) for failure to state a claim.
We review the district court’s dismissal of a complaint for failure to state a claim under Fed.R.Civ.P. 12(b)(6) de novo, accepting all factual allegations as true, but “giving no effect to legal conclusions couched as factual allegations.” Port Dock & Stone Corp. v. Oldcastle Ne., Inc., 507 F.3d 117, 121 (2d Cir.2007).
Legg Mason, Inc. (“Legg Mason”) is a global asset management company. On June 24, 2005, Legg Mason announced that it would swap its brokerage unit for Citigroup Inc.’s worldwide asset management business (“CAM”). The CAM swap closed on December 1, 2005. On March 6, 2006, Legg Mason announced that Citigroup would sell approximately eight million shares of Legg Mason common stock in a secondary public offering pursuant to a registration statement on Form S-3 filed by Legg Mason on February 27, 2006. The prospectus related to the secondary offering became effective on March 9, 2006.
Plaintiffs brought claims under sections 11 and 12(a)(2) of the Securities Act of 1933, alleging that the registration statement did not disclose the following: First, at the time of the secondary offering, Legg Mason had negotiated a deal whereby Peter Wilby, a significant CAM asset manager, would work at Legg Mason until March 2006 to help with the transition, and would then leave to start his own firm, Stone Harbor Investment Partners, and would take $8.5 billion in client assets, as well as dozens of CAM employees, with him. Second, at the time of the secondary offering, Legg Mason was experiencing
a dramatic increase in integration-related expenses that was far in excess of the expense figures that [Legg Mason] had internally budgeted for.... Legg Mason had spent considerable amounts of time and resources on integrating its operations with those acquired in the CAM Swap. As a result of these efforts, Legg Mason was expending increasing amounts of resources on integrating its operations and was attempting to eliminate redundant costs but was largely unsuccessful.... For example, following the CAM Swap, [Legg Mason] was granted an eighteen (18) month license to use Citigroup’s propriety information technology (IT) systems that were used to handle trading and customer processes, among other things. If Legg Mason was unable to develop its own systems and transition to them before the expiration of the 18 months, it would have to pay substantial licensing fees to Citigroup. As a result, [Legg Mason] was feverishly attempting to create the IT systems necessary to run the CAM busi *668 ness and was expending increasing amounts of capital to do so. The expenses associated with this IT project far exceeded [Legg Mason’s] internal expectations and was negatively impacting [Legg-Mason’s] continuing operations.
J.A. 68-69 (emphases added).
Section 11 imposes civil liability on issuers and other signatories of a registration statement if the statement “contain[s] an untrue statement of a material fact or omit[s] to state a material fact required to be stated therein or necessary to make the statements therein not misleading.” 15 U.S.C. § 77k(a). Section 12(a)(2) imposes liability for any person who offers or sells a security “by means of a prospectus ... which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading.” 15 U.S.C. § 771(a)(2). The test for whether an alleged misstatement or omission is material under section 12(a)(2) or section 11 is identical to that under section 10(b) of the Securities and Exchange Act of 1934: whether there is a “ ‘substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the “total mix” of information made available.’ ” Basic Inc. v. Levinson, 485 U.S. 224, 231-32, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988) (quoting TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976)); Rombach v. Chang, 355 F.3d 164, 178 n. 11 (2d Cir.2004). The total mix of information may include “information already in the public domain and facts known or reasonably available to the shareholders.” United Paperworkers Int’l Union v. Int’l Paper Co., 985 F.2d 1190, 1199 (2d Cir.1993). See also id. (“Thus, when the subject of a proxy solicitation has been widely reported in readily available media, shareholders may be deemed to have constructive notice of the facts reported, and the court may take this into consideration in determining whether representations in or omissions from the proxy statement are materially misleading.”).
In this case, news of Wilby’s departure was already in the public domain. It was reported in three newspaper articles and three statements filed with the SEC on December 8, 2005, January 9, 2006, and February 24, 2006. The SEC filings explained that, in anticipation of the swap, Legg Mason had come to a mutually beneficial agreement with a select group of CAM portfolio managers, including Peter Wilby, whereby the group would remain employed with CAM through March 31, 2006 to assist in the transition, and would then be allowed to start a new firm based in New York. See, e.g., Salomon Brothers Series Funds Inc., Supplement to the Prospectuses of the Funds filed with the SEC pursuant to 17 C.F.R. § 230.497, at 1-2 (Dec. 8, 2005). One of the newspaper articles reported that the bulk of Wilby’s high-yield and emerging markets debt teams, between twenty-four and thirty-six people, would go with him to the new firm, and the “firm should start life with more than enough assets under management to be a going concern.” Douglas Appell, Warm Welcome Expected for New Fixed-Income Shop, Pensions & Investments, Dec. 12, 2005, at 26. The article also quoted a consultant who suggested that if Wilby’s new firm could attract between $5 and $8 billion of CAM assets during its first year, “it will be off to a strong start.” Id. Because Wilby’s departure, and the fact that he would take with him CAM employees and client assets, was already in the public domain and was reasonably available to Legg Mason shareholders, the omission of the information from the regis *669 tration statement at issue here was not material.
Plaintiffs’ arguments on this point are without merit. First, United Paperworkers is distinguishable. In that case, we considered a misleading proxy statement that was mailed directly to shareholders in connection with a proposal submitted for shareholder vote. 985 F.2d at 1193-94. In that context, we held that corporate documents that were not distributed to shareholders entitled to vote on the proposal should rarely be considered part of the total mix of information “reasonably available,” and that sporadic news reports did not give shareholders “sufficient notice that proxy solicitation statements sent directly to them by the company may be misleading,” and therefore should also not be considered part of the total mix of information that would clarify the company’s representations in its proxy materials. Id. at 1199 (emphasis added). Because the instant case is not about an allegedly misleading proxy statement mailed to shareholders in connection with a shareholder vote, the fact that corporate documents and news reports were not mailed directly to potential investors is not relevant to whether they can be considered part of the total mix of information reasonably available. Moreover, we agree with Judge Ross that “Hit stands to reason that the universe of information a shareholder would consider when voting in a proxy contest concerning a specific issue is smaller than, or at least different from, the corresponding universe an investor would consider when deciding whether to purchase or ... retain a publicly traded stock in the first instance.” In re Keyspan Corp. Sec. Litig., 383 F.Supp.2d 358, 374 n. 6 (E.D.N.Y.2003).
As for plaintiffs’ argument that we may not consider the SEC filings or newspaper articles on a motion to dismiss, although these documents are not mentioned on the face of the complaint, we have previously held that on a Rule 12(b)(6) motion to dismiss a court may consider matters of which judicial notice may be taken, Staehr v. Hartford Fin. Servs. Group, Inc., 547 F.3d 406, 425 (2d Cir.2008), including “the fact that press coverage ... or regulatory filings contained certain information, without regard to the truth of their contents.” Id. As in Staehr, the press articles and SEC filings here were offered only to show that information about Wilby’s departure was publicly available, not for the truth of the matters asserted therein. Id. at 425-26. The fact that defendants did not formally file a request for judicial notice is not relevant, as Federal Rule of Evidence 201(c) provides that “[a] court may take judicial notice, whether requested or not.”
Finally, we agree with the district court that the Complaint’s allegation regarding the “dramatic increase in integration-related expenses that was far in excess of the expense figures that the Company had internally budgeted for” is too conclusory to permit us to determine whether plaintiffs have adequately pleaded materiality. As discussed above, sections 11 and 12(a)(2) impose civil liability only for statements or omissions that are material. Yet this complaint does not contain a single factual allegation relating to the magnitude of the expense increase, which would be necessary to determine whether plaintiffs pleaded a substantial likelihood that the disclosure of the expense increase would have been viewed by a reasonable investor as significantly altering the total mix of available information. Under Bell Atlantic Corp. v. Twombly, a complaint requires “more than labels and conclusions”; instead, “[fjactual allegations must be enough to raise a right to relief above the speculative level.” 550 U.S. 544, 555, *670 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). Merely alleging that the expense increase was “dramatic,” or “far in excess” of the figures the company had internally budgeted for, is not sufficient to plead a material omission. Neither is the allegation that Legg Mason was spending “increasing amounts of resources on integrating its operations” with Citigroup’s in order to avoid paying “substantial” licensing fees, or that this was “negatively impacting” Legg-Mason’s continuing operations. “While we accept as true the factual allegations in the complaint ..., we are not bound to accept conclusory allegations or legal conclusions masquerading as factual conclusions.” Rolon v. Henneman, 517 F.3d 140, 148-49 (2d Cir.2008) (internal quotation marks and brackets omitted). Therefore, this claim was properly dismissed.
We have considered all of plaintiffs’ other arguments and find them without merit. For the foregoing reasons, the judgment of the district court is AFFIRMED.